IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF: ) | |
| ) | |
| A.H., by her parent and next friend, ) | |
| AYANNA JOHNSON ) | |
| ) | Case No. 17-2204 |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| ST. LOUIS PUBLIC SCHOOL DISTRICT ) | |
| ) | |
| Serve Dr. Kelvin Adams at: ) | |
| 801 N. 11th Street ) | |
| St. Louis, Missouri 63101 ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

Plaintiff A.H., by her mother and next friend, Ms. Ayanna Johnson, by their attorneys, submit the following Complaint:

### INTRODUCTION

1. This action is brought by Ayanna Johnson on behalf of her daughter, Plaintiff A.H., as an appeal of an administrative decision pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* Defendant St. Louis City School District refused to recognize the gravity of A.H.'s mental health and behavioral needs despite her long, well-documented history of active hallucinations, paranoia, depression, attempts of self-harm, and delusional thinking. Because Defendant failed to provide A.H. with the safeguards and services appropriate for her unique needs, A.H. has made virtually no educational progress since her initial evaluation for special education services in May 2012 – in fact, she has regressed both academically and behaviorally.

1

2. Plaintiff seeks an order overturning the Administrative Hearing Commission's ("AHC") decision and finding Defendant's actions violated the IDEA. In order to remedy these violations, Plaintiff seeks a separate, private educational placement at Giant Steps, a therapeutic school located in St. Louis, Missouri; compensatory education; declaratory relief; and a permanent injunction from the unlawful educational practices that are in violation of the IDEA. Finally, Plaintiff seeks reasonable attorney fees and litigation costs for pursuing this action both here in the District Court and at the Administrative Hearing Commission ("AHC").

## PARTIES

3. Plaintiff A.H. is child with a disability as the term is defined in the IDEA, 20 U.S.C. § 1401(3). Ms. Ayanna Johnson ("Parent") is the natural parent of A.H. pursuant to 20 U.S.C. § 1401(23)(A). A.H. and Parent reside in the City of St. Louis, Missouri and are residents of the St. Louis City School District.

4. Defendant St. Louis City School District ("SLPS" or the "District") is the governmental unit responsible for administering public special education schools, programs, and services within the area it serves. The District is a local education agency ("LEA") as the term is defined in 20 U.S.C. § 1401(19)(A).

## JURISDICTION AND VENUE

5. This Court has jurisdiction of this case pursuant to 20 U.S.C. § 1415(i)(2)(A) and 28 U.S.C. § 1331.

6. Declaratory relief is authorized by 28 U.S.C. §§ 2200, 2201.

7. Venue is proper in this Court because the acts complained of occurred within the Eastern District of Missouri.

8. Plaintiff has exhausted the IDEA's administrative remedies and has otherwise fulfilled all conditions precedent to the institution of litigation under 20 U.S.C. § 1415 *et seq*.

## STATUTORY FRAMEWORK

9. The IDEA was enacted to provide a free appropriate public education ("FAPE") to students with disabilities. 20 U.S.C. § 1412(a)(1)(A).

10. A FAPE consists of special education and related services that meet the standards of the State educational agency[1] and are provided in conformance with an individualized education program ("IEP"). 20 U.S.C. § 1401(9).

11. Special education consists of instruction that is specially designed to meet the unique needs of the child. 20 U.S.C. § 1401(29).

12. Related services consist of transportation, and such developmental, corrective, and other supportive services as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children. 20 U.S.C. § 1401(26).

13. Each school district also has an obligation to identify, locate, and evaluate, as that term is defined by the IDEA, all children with disabilities ages three through twenty-one, who reside within the district. This mandate is often referred to as "Child Find." 20 U.S.C. 1412 *et. seq.;* 34 C.F.R. 300.111.

14. A district has the obligation to conduct a full and comprehensive evaluation for each student who is suspected of having a disability. 34 C.F.R. 300.111. The evaluation must test the child in all areas related to the specific disability and must be sufficiently comprehensive to

---

[1] The Missouri Department of Elementary and Secondary Education ("DESE") is the State educational agency for Missouri.

3

identify all the child's needs by way of special education and related services irrespective of whether they are commonly linked to the child's disability. 34 C.F.R. 304(c)(4)-(6).

15. If a student is determined eligible for services under the IDEA, the district is required to develop an Individualized Education Program ("IEP") for the student. An IEP is a written statement of a child's present levels of educational performance, including how the child's disability affects his or her involvement and progress in the general curriculum, a statement of measurable annual goals and short term objectives, a statement of special education services that are to be provided to the child, and an explanation of the extent to which the child will not participate with non-disabled students. 20 U.S.C. §§ 1401(14) and 1414(d)(1)(A).

16. The IEP must be developed prior to the initiation of special education services. The IEP must be reviewed by the IEP team at least once a year, or more often if the parents or school asks for a review. If necessary, the IEP may be revised during the IEP meeting. Parental participation is required in both the development and review of the student's IEP. 20 U.S.C. § 1414(d)-(f).

17. Following initial eligibility, a school district must also comprehensively and timely re-evaluate each IDEA-eligible student to determine the student's need for additional or different educational programming and services. 34 C.F.R. 300.303. Comprehensive reevaluations must occur at least once every three years and should occur earlier if the student's needs, such as the student's failure to progress, warrant reevaluation or if the child's parent or teacher requests a reevaluation. 34 C.F.R. 300.303.

18. The IDEA requires the educational program provided by the school be reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances. *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 U.S. 988, 1001 (2017).

19.     Parents who believe that a school district has not met its obligations under the IDEA may file a due process complaint to have the dispute resolved at an impartial due process hearing conducted by the Missouri Administrative Hearing Commission. 20 U.S.C. § 1415(f)(1)(A); Mo. Rev. Stat. 162.670 *et seq.;* and the Missouri Regulations Implementing Part B of the IDEA, Missouri Department of Elementary and Secondary Education (2016) ("State Plan").

20.     A party aggrieved by the findings and decision of the AHC has the right to bring a civil action in federal court. 20 U.S.C. § 1415(i)(2)(A). The district court must then review the administrative record, hear additional evidence if requested, and basing its decision on the preponderance of the evidence, grant such relief as it determines is appropriate. 20 U.S.C. § 1415(i)(2)(C).

## STATEMENT OF FACTS

21.     A.H. is a child with medical diagnoses of Schizophrenia, Autism Spectrum Disorder, and Major Depressive Disorder.

22.     A.H. was found eligible for special education and related services under the IDEA in May 2012.

23.     A.H.'s current educational identification is Emotional Disturbance ("ED").

24.     A.H. was born on July 12, 2002 and was diagnosed with Autism on or around October 25, 2013 and Major Depressive Disorder in 2009. Schizophrenia was later diagnosed on or around September 13, 2015.

25.     A.H.'s schizophrenia manifests in several ways, including, consistent and ongoing hallucinations; thought broadcasting persecution reference, i.e., A.H. believes the television talks to her and that she can control the actions and images on the television screen; paranoia; and delusional thinking.

26. A.H.'s Autism diagnosis manifests in her poor social skills. She has difficulty making eye contact with other people and difficulty engaging with her peers in age-appropriate ways. Additionally, she repeats phrases that other people say to her, which is referred to as "echolalia."

27. A.H.'s depression manifests in negative automatic thoughts, which means she assumes she will fail when confronted with a new activity. A.H. has a history of self-harm and has undergone treatment for cutting herself.

28. A.H.'s maturity level is not like her same-aged peers. Both A.H.'s mother and psychologist report that A.H., who is fifteen, frequently plays with dolls at home, talks in a child-like or baby voice, and has trouble relating to same-aged peers.

29. Beginning in 2nd grade (2009-2010), Parent received communications from A.H.'s teachers that A.H. was "zoning out" and mumbling to herself in class. A.H. also had issues staying focused and retaining information. At this time, A.H.'s hallucinations became noticeable, and A.H. was destructive, sometimes violent, and would not play with other children. Some of A.H.'s teachers tried to work with A.H. one on one in class to address A.H.'s emerging issues, but no official plan was put into place.

30. As a result of A.H.'s struggles, A.H. began seeing Dr. Vivian Knipp, PhD, a psychologist at Affinia Healthcare Child Development Center (formerly Grace Hill Health Center) in 2009.

31. A.H. began seeing a psychiatrist at Affinia in 2009 as well and has consistently received treatment since that time. Her current psychiatrist is Dr. Juee Phalak, M.D.

32. Thereafter, Parent began to develop significant concerns over A.H.'s lack of academic, social, and behavioral progress at school. Parent consistently communicated her

concerns to the school starting in 2009; however, A.H. was not evaluated for special education services until May 2012, the end of her fourth-grade school year.

33. When the District finally determined A.H. was eligible for special education services, they found her educational identification to be Specific Learning Disability in the areas of reading comprehension and mathematics reasoning.

34. At the time of A.H.'s special education evaluation, A.H. had noted medical diagnoses of Depression and Autism and was hallucinating regularly, however, no services or goals relating to those diagnoses or their related symptoms were provided in A.H.'s IEP.

35. In 6th and 7th grade, A.H. began regressing academically and her hallucinations and symptoms of paranoia increased dramatically. She started having auditory hallucinations in addition to the visual hallucinations that she had been experiencing for some time. She heard voices telling her to harm herself and others. She believed someone at school was "putting stuff" in her food and refused to eat during the school day. She was also bullied by other students.

36. Parent and A.H.'s providers at Affinia regularly communicated with the District to inform the District about any new symptoms and diagnoses and to articulate their concerns about A.H.'s academic regression and A.H.'s lack of safety at school.

37. After repeated complaints from Parent and Affinia providers, District agreed to re-evaluate A.H. during the seventh-grade school year (2014-2015) on January 7, 2015. The re-evaluation report discussed A.H's hallucinations and identified A.H.'s imaginary friend, Alicia, to whom she talked often. District Staff spoke with Dr. Knipp on the phone during the re-evaluation. While A.H.'s providers were known to the District at the time of re-evaluation and the District had their contact information and authorization to speak with them, the District did not request A.H.'s medical records.

38. After conducting the re-evaluation and speaking with Dr. Knipp, the IEP team changed A.H.'s educational identification to Emotional Disturbance. While the diagnosis changed, the February 2015 IEP submitted to Parent was not substantively different from the IEPs that failed to provide A.H. an appropriate education in the past.

39. The February 2015 IEP contained seven goals – all of which focused on the same reading comprehension and math issues on which A.H. had failed to progress since 2012. None of the goals were related to A.H.'s new Emotional Disturbance diagnosis or the disabilities that qualified her for such a diagnosis.

40. While the February 2015 IEP included a Behavior Intervention Plan ("BIP"), the plan was by and large not followed by the District. For instance, A.H. was supposed to meet with a counselor for fifteen minutes every other week and the counselor was supposed to share the data from those meetings with Dr. Knipp after they occurred. There is no record the counselor ever met with A.H. as outlined by the BIP and no data was ever shared with Dr. Knipp. To the extent any part of the BIP was implemented, it was not effective. This was demonstrated by the fact that A.H. made no measurable progress from the IEP meeting in February 2015 to February 2016.

41. After several letters from A.H.'s medical providers and many requests from Parent, the District moved A.H.'s placement from a regular classroom at least 80% of the time to inside the regular classroom less than 40% (a self-contained setting) in February 2016. The goals in A.H.'s February 2016 IEP were nearly identical to those in her February 2015 IEP.

42. The 2016 BIP removed bi-weekly school counselor meeting minutes and instead required A.H. to keep a journal of her "positive and negative school experiences" that were supposed to be reviewed by the counselor once a month. There is no record this was ever done.

43. In August 2016, A.H. started her Freshman year at Sumner High School ("Sumner") in the District. When A.H. began attending Sumner, there was no self-contained classroom and A.H. did not receive the special education minutes as outlined in her February 2016 IEP. Additionally, A.H. was placed in two auxiliary classes in the general education setting in which she received no special education supports.

44. A.H. became more depressed at the start of the school year. She cried every day before school and asked her mother not to make her go. A.H.'s hallucinations and symptoms of paranoia began to increase. A.H.'s interactions with imaginary friends also increased. A.H. became aggressive toward family members and peers in school. A.H. threatened her mother and made statements about killing herself and stabbing her grandmother. A.H. was assaulted on numerous occasions at school by classmates, and school personnel frequently called Parent to pick A.H. up from school or to keep her out of school entirely.

45. Parent began communicating her concerns to the District as early as August 2016 and continued communicating her concerns throughout the fall semester. When she asked why A.H. was not receiving the services outlined in her IEP, she was told the self-contained classroom "was not set up yet." Ms. Johnson repeatedly requested IEP meetings from August to November 2016, but no meeting was scheduled.

46. As A.H. became more violent and her hallucinations increased, she also continued to regress academically. Per A.H.'s November 30, 2016 STAR assessments, she regressed from a third-grade reading level in February 2016 to a second-grade reading level.

47. Dr. Phalak and Dr. Knipp submitted a joint letter to the school on November 14, 2016, recommending A.H.'s transfer to a therapeutic school setting. They expressed concern for

A.H.'s safety and explained that A.H.'s hallucinations, delusions, and fear of her peers render her unable to manage the social environment of a public high school setting.

48. The District began re-evaluating A.H. yet again in December 2016 and requested a medical release from Parent to communicate and exchange information with A.H.'s doctors at Affinia. Despite having the release, the District did not request records from any of A.H.'s providers and did not speak to any of A.H.'s providers with the exception of one, brief phone call to Dr. Knipp. The District did not hold an IEP meeting to discuss the results of A.H.'s evaluation until March 2017.

49. While the District was conducting its four-month long evaluation, A.H. continued to be bullied and threatened by fellow classmates and Parent was again instructed to keep A.H. home from school for a number of days for her safety. During this time, A.H. continued to deteriorate academically – now regressing to a first-grade reading level on her STAR Reading test. Throughout the evaluation, Parent continually requested that A.H. be moved to a separate, private placement.

50. In 2013, A.H. was able to convert decimals into percentages. In 2014, she knew all of her multiplication tables. By the March 2015 IEP, A.H. could no longer do these things. Instead, she struggled with basic addition and subtraction, counting money, and telling time on an analog clock, and made no progress in these areas by the March 2017 IEP meeting.

51. At the March 9, 2017 IEP meeting, Ms. Johnson again requested that A.H. be moved to a separate, private placement because she was not making any academic or behavioral progress and she was not safe in her current placement. Instead, the IEP team added thirty minutes of counseling per week for a month.

52. On March 17, 2017, Parent, through counsel, filed a due process complaint with the Missouri Department of Elementary and Secondary Education and the District's Superintendent Dr. Kelvin Adams pursuant to the dispute resolution procedures outlined in the IDEA, its implementing regulations, and the Missouri State Plan.

53. Parent alleged the District denied A.H. a FAPE and requested A.H. be placed in a separate, private, therapeutic school setting and requested compensatory services sufficient to remediate for the deficiency in services A.H. received in the past.

54. In its Response to A.H.'s Complaint, the District maintained A.H.'s placement at Sumner as outlined in the February 2016 IEP was appropriate for A.H.

55. A two-day Due Process hearing was scheduled for April 25 and April 26, 2017. At 3:47 a.m. on April 25, 2017, Respondent filed a Motion in Limine, or in the Alternative Motion for Continuance to Permit the IEP Team to Consider Petitioner's Exhibit 5, arguing that the District did not have access to the medical records from Affinia contained in Petitioner's Exhibit 5, which Petitioner had timely submitted to the District five days before the Due Process Hearing as required by the Missouri State Plan. At the hearing on April 25, 2017, the Administrative Hearing Commissioner, Brett Berri, granted the District's motion for a continuance to permit the District to reconvene A.H.'s IEP team to review and, if necessary, revise A.H.'s IEP, taking into consideration information contained in Petitioner's Exhibit 5.

56. Throughout middle and high school, A.H.'s doctors regularly and consistently sent letters to the District discussing the contents of Exhibit 5. Stacie Bryant, a Social Worker from Affinia Healthcare, attended IEP meetings on behalf of A.H. with District staff while A.H. was in middle school. In addition, Respondent conducted three re-evaluations of A.H. while she was under Affinia's care. The District had an authorization to communicate with Dr. Knipp per the

February 2015 IEP and BIP. The District finally requested a medical authorization for all Affinia providers during its third re-evaluation of A.H. in December 2016, and it chose not to request records at that time.

57. In accordance with the Commissioner's order postponing the hearing, an IEP meeting was convened at Sumner on May 3, 2017, where the District determined a separate, private, therapeutic school setting was appropriate for A.H. and determined A.H. should receive $5,000.00 in "compensatory services" but did not specify what "compensatory services" A.H. was to receive. The District refused to memorialize its change of heart regarding A.H.'s placement and need for compensatory services in an enforceable, consent judgment or decree.

58. On May 10, 2017, the District moved to dismiss the case, stating "the District has voluntarily changed Student's placement to that preferred by Parent and has made compensatory services available to Student…without the need for a hearing or an order compelling such action."

59. Commissioner Berri denied the District's motion holding, "this case is not moot" as there is "no mechanism in place to prohibit Respondent from simply changing its mind" regarding the services the District proposes in the May 2017 IEP.

60. A two-day Due Process hearing was eventually held on May 24, 2017 and May 25, 2017 before the AHC. Commissioner entered his decision on June 23, 2017, and a copy of the same is attached hereto as Exhibit A and incorporated here by reference.

61. The Commissioner found that A.H. did not progress in the Fall 2016 Semester at Sumner. The Decision also noted that in her first semester as a freshman, A.H. did not receive the services outlined in her February 2015 IEP, was involved in various physical altercations at school, made suicidal comments, regressed academically, and even declined hygienically.

62. Yet, the Commissioner determined the March 9, 2017 IEP, which was substantively identical to the February 2015 IEP but for the addition of 30 minutes of counseling per week for a month, "built upon the modest successes A.H. achieved...in the eighth grade" and was "reasonably calculated to allow A.H. to make progress appropriate in the light of her circumstances."

63. The Decision held A.H.'s placement in the March 9, 2017 IEP was not objectively unreasonable and the IEP created goals and a Behavior Intervention Plan that "directly responded" to A.H.'s schizophrenia diagnosis.

64. The Decision also addresses the appropriateness of the May 3, 2017 IEP, which was created after Parent filed her Due Process Complaint and which was admitted into evidence at the hearing over Petitioner's objection. After holding the March 9, 2017 IEP was appropriate for A.H., including A.H.'s placement at Sumner, the Decision states, "[w]e believe that at the conclusion of this case, when the 'stay put' provision of the IDEA is lifted, the May 3, 2017 Notice of Action changing A.H.'s placement will supersede the March 9, 2017 IEP, and she can begin in a private separate day facility, as Parent requested in her due process complaint."

65. The Decision then states, "Parent failed to carry her burden of showing the District denied A.H. a FAPE."

## CAUSE OF ACTION

66. Plaintiff restates and re-alleges each of the allegations set forth in the foregoing paragraphs.

67. Plaintiff is a party aggrieved by the findings and decision of the Commissioner.

68. Plaintiff hereby appeals all issues on which she did not prevail pursuant to Commissioner Berri's decision, and she seeks relief under 20 U.S.C. § 1415.

69. The findings of the Commissioner are erroneous and are not supported by law or by controlling legal principles under IDEA.

70. The evidence presented at the due process hearing did not fairly and rationally support the Commissioner's findings against Plaintiff, and the Commissioner's decisions in favor of the District were contrary to the evidence. The evidence showed that the District denied A.H. a free and appropriate public education because the educational plan and services provided by the District were not reasonably calculated to enable A.H. to receive an educational benefit.

71. As result of the District's actions, Plaintiff has suffered extreme harm including, but not limited to, loss of educational opportunities and programs and denial of due process

72. Plaintiff has been denied meaningful and equitable educational opportunities and programs, as guaranteed by federal and state law.

### PRAYER FOR RELIEF

73. WHEREFORE, Plaintiffs respectfully pray that this Court assume jurisdiction of this action and:

a. After considering relevant additional evidence, conduct a modified *de novo* review of this matter and find in favor of Plaintiffs on all issues. That this Court assume jurisdiction over this action;

b. Issue a declaratory judgment that the District's substantive educational and due process practices, policies, procedures, and conditions violated Plaintiffs' rights as secured by IDEA.

c. Grant Plaintiff a preliminary and permanent injunction enjoining the District, its agents, successors, employees, attorneys and those acting in concert with Defendant, from continuing to violate Plaintiffs' rights under and IDEA.

d. Enter an Order requiring the District to provide Plaintiff the relief sought at the impartial due process hearing.

e. Enter an Order requiring the Board to make Plaintiffs whole by awarding A.H. compensatory education and/or the educational services she would have received in the absence of the District's unlawful conduct.

f. Award Plaintiff reasonable attorney fees and costs in reimbursement for all time spent pursuing the instant litigation.

g. Award Plaintiffs such relief as the Court deems appropriate. 20 U.S.C. § 1415.

h. Grant such other relief and benefits as the cause of justice may require.

Respectfully Submitted,

*/s/ Sarah Jane Hunt*
Susannah Porter Lake, #MO68758
Luz Maria Henriquez, #MO66783
Amanda J. Schneider, #MO59263
Legal Services of Eastern Missouri
4232 Forest Park Blvd.
St. Louis, Missouri 63108
Tel. (314) 534-4200 Ext. 1312
Fax (314) 534-1075
splake@lsem.org

Thomas E. Kennedy, III, #MO46617
Sarah Jane Hunt, #MO63899
Law Offices of Thomas E. Kennedy, II
906 Olive Street, Ste. 200
St. Louis, MO 63101
(314) 872-9041
(314) 872-9043 fax
(314) 880-4461 direct
tkennedy@tkennedylaw.com
sarahjane@tkennedylaw.com